IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 21, 2016

**STATE OF TENNESSEE v. MONICA DAWN HAMMERS**

**Appeal from the Criminal Court for Hamilton County**
**No. 280694    Barry A. Steelman, Judge**

_____

**No. E2015-00464-CCA-R3-CD – Filed July 26, 2016**

_____

A Hamilton County jury found the Defendant, Monica Dawn Hammers, guilty of attempted aggravated child abuse. Pursuant to an agreement between the parties, the trial court sentenced the Defendant as a Range I offender to serve a nine year sentence through supervised probation. On appeal, the Defendant asserts that: (1) the evidence presented at trial is insufficient to support her conviction; (2) the trial court erred in allowing the State to present evidence of the Defendant's prior bad acts; and (3) the trial court failed to instruct the jury on lesser-included offenses. After a thorough review of the record and applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Donna Miller, Chattanooga, Tennessee, for the appellant, Monica Dawn Hammers.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Neal Pinkston, District Attorney General; and Charles D. Minor, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Background and Procedural History**

This case arises out of an interaction between the Defendant and her child while the child was a patient at Erlanger hospital in Chattanooga, Tennessee. A Hamilton County grand jury indicted the Defendant for attempted first degree premeditated murder

and aggravated child abuse for placing a small pillow over her four-year old son's ("the victim") face.

At trial, the State presented the following proof: Jeremy Harrison, a pediatrician who practiced in Murfreesboro, Tennessee, testified that he treated the victim from the time he was four months old. Dr. Harrison stated that initially his interaction with the Defendant and victim was for routine health maintenance exams, but, as time progressed, the Defendant had "concerns about specific medical things" involving the victim that Dr. Harrison would do his "best to address." One of the concerns, raised when the victim was six months old, was regarding the victim's circumcision. When the Defendant was not satisfied with Dr. Harrison's explanation as to her concerns, he referred her to a specialist at Vanderbilt hospital, John Brock, who agreed with Dr. Harrison's assessment and attempted to reassure the Defendant that the procedure had been done correctly. The Defendant made another appointment eight or nine months later with the specialist related to the same concern.

Dr. Harrison testified that, at some point, the Defendant reported the victim developing difficulty with urinating. The victim was having "urinary accidents" after he had been dry for an extended period of time, and Dr. Harrison confirmed through an examination that the victim's meatus, the hole in the opening of the penis, was too small. Dr. Harrison referred the victim to a urologist in Chattanooga, Tennessee. Ultimately, a surgical procedure was performed to fix the meatal stenosis.

Dr. Harrison testified that in "those early months" the victim had "some problems" with upper respiratory infections, cold viruses, stomach viruses, "typical childhood illnesses," but there appeared to be a continuing complaint regarding abnormal bowel movements. From age four months through his one-year visit, the Defendant reported that the victim had loose bowel movements and was concerned that the victim was allergic to several food items. In January 2008, shortly before the victim's first birthday, the Defendant reported that the victim had suffered an allergic reaction to eggs. Based upon the Defendant's concerns, Dr. Harrison ordered blood allergy testing for concerns about lactose and eggs. The laboratory data showed no sensitivity to eggs. The Defendant continued to report the victim's sensitivity to lactose, citric acid, eggs, soy, anything canned, soup, and vegetables. Dr. Harrison referred the victim to an allergist for further allergy testing.

Dr. Harrison testified that the allergist conducted "skin testing," and the victim showed no sensitivity to apple, beef, crab, egg, lobster, milk, orange, peanuts, soybeans, strawberry, and yeast. In addition to the skin issues, the Defendant reported vomiting and diarrhea as recurrent problems for the victim, along with abdominal pain. Because these issues had been chronic, Dr. Harrison referred the victim to a gastroenterologist, Brian

2

Riedel, at Vanderbilt hospital. Dr. Harrison said that the gastroenterologist's assessment indicated that the victim had "chronic diarrhea with rash and failure to thrive, multiple perceived food triggers by history, and an inadequate, restricted and inappropriate diet." Several days after meeting with the gastroenterologist, the Defendant met with Dr. Harrison at his office to discuss the laboratory findings which she had retrieved through the Vanderbilt hospital computer system. The victim's lab results were all within the normal range except for "a slight elevation in some thyroid function," so Dr. Harrison referred the victim to an endocrinologist. The subsequent laboratory findings regarding the victim's thyroid were all in "the normal range."

Dr. Harrison testified that the Defendant took the victim for a follow-up visit with the gastroenterologist at Vanderbilt hospital for continued abnormal stools. The Defendant reported that the victim only drank organic tea because "he wouldn't drink anything else." The assessment again indicated that the victim was having "some erratic stools" and genetic testing related to a possible fructose transport defect came back normal.

Dr. Harrison testified that, at the Defendant's request, he referred the victim to a gastroenterologist, Douglas Laman, at T.C. Thompson Children's Hospital in Chattanooga, Tennessee. Dr. Laman conducted his own evaluation and also did not find any significant allergens related to the reported problems. Due to conflicting reports from the Defendant and the victim's father about the victim's diet and stool, the victim was admitted to the hospital for observation. The victim's father told Dr. Harrison that, when the victim was with him, the victim ate what he wanted, other than dairy, "and did fine with that." Dr. Harrison confirmed that he had been aware since December 2008 that there was an ongoing custody dispute between the Defendant and the victim's father.

In addition to the other physicians, Dr. Harrison referred the victim to a podiatrist for foot pain related to plantar fasciitis in 2010. After meeting with the podiatrist, the Defendant called Dr. Harrison's office requesting a referral to an orthopedist for a second opinion. Dr. Harrison stated that his last office visit with the victim was in November 2010.

Douglas Laman testified as an expert witness in the field of pediatric gastroenterology. Dr. Laman said that he began seeing the victim in September 2009, when he was about two and a half years old. He stated that he reviewed the records from Vanderbilt hospital and then conducted his own testing, some of which was duplicative. He performed an upper endoscopy, which included biopsies of lactose and sucrose intolerance. The results showed a mild lactase deficiency but otherwise "everything came back normal." The victim also underwent a flexible sigmoidoscopy. The results for that test were normal as well.

3

Dr. Laman testified that the victim's father was not present initially but became more so "toward the end." Dr. Laman described the relationship between the Defendant and the victim's father as contentious with a "confrontation" occurring one time in the waiting room that required security. Dr. Laman said that the Defendant and the victim's father contradicted one another in terms of their reports on the victim's health and diet. Dr. Laman confirmed that he was aware of ongoing custody issues between the Defendant and the victim's father.

Dr. Laman testified that the victim's symptoms, diarrhea and intolerance to sucrose and lactose, were reported by the Defendant. Dr. Laman recommended Sucraid, a replacement enzyme, to help with sucrose. He noted that there was clinical evidence that the Sucraid may have helped "a little bit," but because the victim's sucrose level was within the normal range, he did not think the Sucraid should have "made a whole lot of difference." Other than the mild lactose intolerance, Dr. Laman said he did not find any issues related to the symptoms presented. He stated that the victim's lactase level was 11.6 with the normal range being 16.5 and above. Generally speaking, a person with a level of ten or twelve could have two glasses of milk but any more than that would likely cause abdominal pain, cramps, and diarrhea.

Dr. Laman testified that the victim's father maintained that the victim ate what he wanted to while at his house and did not have diarrhea. The Defendant stated that the victim's father did not follow the victim's diet, did not give the victim his medications, and then the victim would return home with diarrhea. Because the parents had such differing accounts, Dr. Laman decided to admit the victim to the hospital for a week with a "regular diet" and no medications. Dr. Laman also decided that there would be a sitter in the room with the victim the entire time to ensure that nothing was being "given to the child" to alter the results of the observation.

Dr. Laman testified that the victim was admitted to the hospital on May 2, 2011. The admitting order read, "diagnosis, chronic diarrhea, custody issues, suspected abuse or neglect, stable condition, regular diet, activity, 24-hour sitter observation, strict eyes, nose and daily weights." The victim had presented with diarrhea and poor growth. Dr. Laman recalled that, while in the hospital, the victim was on a regular diet, no lactose restrictions, no lactase supplementation with "no issues presenting." Specifically, the victim went two or three days without a bowel movement.

Dr. Laman testified that one night, at approximately 9:30 p.m., a resident at the hospital called Dr. Laman and told him that the Defendant "had put a pillow over [the victim's] face." Dr. Laman instructed the resident to contact security "and have [the Defendant] removed." Dr. Laman said that "the plan" originally was to discharge the

4

victim on May 6, but due to "social issues," the victim remained in the hospital. The victim was later discharged to his father's custody on a regular diet.

Dr. Laman testified that, before the "pillow incident," DCS was contacted regarding the Defendant on May 5, 2011. The contact or complaint was related to the victim's medical issues being unfounded. Dr. Laman acknowledged that the Defendant appeared to experience some "increased anxiety" during her three-day stay at the hospital. Dr. Laman attributed this anxiety to the fact that the victim was experiencing no diarrhea. Dr. Laman read a hospital note that stated, "sitter noted that patient is eating more of his meals than mother reports." Another note indicated that the Defendant "took [the victim] by the arm, shook him, and after letting him go, his balance was off and he fell and hit his head on the side rail."

Dr. Laman read the following hospital note aloud:

About 18:35, [the victim] started whining. . . . [The Defendant] went to the bathroom, came back out and he was still whining. At that time, according to Ms. Omega, [the Defendant] states, '[victim], I'm not having this whining, stop whining,' then she grabbed a pillow that was in the bed, placed it over his head for one to two seconds, . . . patient was lying in the bed, [the Defendant] was standing beside the bed. [The Defendant] then looked up and saw Ms. Omega watching her, so she dropped the pillow and ran to the bathroom. [The Defendant] stayed in the bathroom for five minutes. Patient was laying in bed quietly looking at the DVD player, then [the Defendant] came out of the bathroom, picked child up, sat down on the couch loving on him, saying, 'Mommy loves you, you can't whine, you're Mommy's world.' At this point Ms. Omega went to the door, . . . motioned for Brandy to come . . . to the door. She told Brandy to tell the patient's nurse that the [Defendant] had tried to smother [the victim].

Dr. Laman identified records of nurse observations during the victim's stay in the hospital. Dr. Laman agreed that the nursing notes indicated that the Defendant told a nurse on two occasions during the same day that the victim had diarrhea; however, there was no medical documentation that the victim experienced diarrhea at any time during his hospital stay. The notes described the Defendant, from May 2 through May 5, 2011, as "anxious, restless, [and] inappropriate." Following the Defendant's removal from the room, the nursing notes indicated that the victim was "playful and alert."

Dr. Laman testified that he had worked with Omega Harkless, the sitter, for eleven and a half years and never received any complaints regarding her work. He further stated

5

that he had never known Ms. Harkless to "blow[ ] something out of proportion." Dr. Laman explained his concern related to the incident as follows:

> [T]he whole problem here was that there seemed to be the diarrhea. As this played out and I continued to see the child, seemed to be that the diarrhea issue was a way of kind of limiting visitation to the father. And then as we got different stories from the two, from the [Defendant] saying [the victim] has diarrhea, the dad saying [the victim] doesn't, which prompted this whole in-house observation with food and seeing if he truly had diarrhea or not, which turns out he did not, so that was to check and see, you know, what was actually happening.
>
> As a result of these claims, I mean, he's undergone, he underwent two upper endoscopies, two scoped from above; a colonoscopy from me; and then numerous lab tests and stool studies, which probably, if I'd been a little quicker and done this earlier, we could have avoided some of that.
>
> But we got - - we kind of figured it out, and, you know, putting a pillow over somebody's face, to me, I mean, I've never done that, don't intend to, but it's not a normal behavior, and my thought on the whole process is that this seemed to happen the evening after we consulted Department of Human Services or Child Protective Services to - - because we were getting ready to discharge him, so at that time everything had kind of unfolded, we knew this kid was not having diarrhea, and then this event happens that following night.

On cross-examination Dr. Laman agreed that in February 2010, he was deposed related to custody issues involving the victim. Dr. Laman agreed that, during the deposition, he stated the victim "probably had a sucrose intolerance," and that he believed the Defendant was "truthful" with him. He explained that the depositions were taken a year and a half before the victim was admitted to the hospital and before the victim's father became involved in the treatment. Dr. Laman agreed that a nurse note on May 4 indicated "Bristol type 5" but within the same sentence said "soft." The doctor agreed that Bristol type 5 is consistent with diarrhea. Dr. Laman explained that the notes were unclear about whether it was a nurse observation or the Defendant reporting to the nurse. The resident note for May 4 indicated that the victim's stool was normal.

Omega Harkless testified that she worked as a unit clerk and sitter at T.C. Thompson Children's Hospital. Ms. Harkless stated that she had worked in medical care for approximately twenty-five years. She confirmed that, prior to this incident, she had worked as a sitter for children when there was an allegation of abuse. She said that this

was the first time she had ever had occasion to report an incident of this nature while acting as a sitter. Ms. Harkless stated that she had not met the Defendant or the victim prior to May 5, 2011.

Ms. Harkless testified that she was assigned to the victim from 7:00 a.m. until 7:00 p.m. on May 5, 2011. When Ms. Harkless arrived at work, the Defendant and the victim were sleeping. The Defendant and the victim woke up around 7:15 a.m. when the breakfast food trays were delivered. The Defendant got up, went to the bathroom, and then returned to set up the food tray for the victim. Ms. Harkless recalled that the victim ate "pretty good," but that the Defendant took his tray before he was finished. The victim whined, indicating he wanted more food, and the Defendant responded that he had "had enough." Ms. Harkless estimated that the victim had eaten less than half of the food on the tray.

Ms. Harkless testified that the victim continued to whine, and the Defendant became frustrated with him. The Defendant made a phone call and told the victim to be quiet while she was talking with an attorney. Ms. Harkless stated that she thought this was an odd comment to make to the victim based upon his age. The victim watched television while the Defendant stepped outside to smoke. When she returned, she sat in a chair while he continued to watch television. At some point, the Defendant began "fussing" at the victim because he was whining, and she grabbed the victim by both arms, shook him, and said, "I don't want to hear this noise, [victim]," before "plop[ping]" him down on the bed "real hard." The victim fell over and hit his head on the side rail of the hospital bed and began crying. Ms. Harkless notified the nursing staff who checked the victim's head for injury.

Ms. Harkless testified that she recommended that they go to the playroom because the Defendant was frustrated with the victim. In the playroom, Ms. Harkless and the Defendant were seated at a small table while the victim was nearby playing with trains. The Defendant repeatedly called the victim to come over to her, and he continued to play with the trains. At some point, he acquiesced and went over to the Defendant, and she "shook him real close." Ms. Harkless was concerned because this was the second time she had seen the Defendant "grab" the victim, so she left the playroom and notified nurses. When they returned from the playroom, the lunch trays were in the room.

Ms. Harkless testified that the victim did not want to eat when they returned to the room after visiting the playroom, so the Defendant and the victim took a nap for an hour or an hour and a half. The Defendant woke up first, at around 5:30 p.m., and walked around the victim's bed stretching. The victim then woke up and began whining, and the Defendant "grabbed the pillow, shoved it over his face." While doing so, the Defendant said, "I'm not going through this, [victim] . . . I'm not hearing this." Ms. Harkless

7

described the Defendant's actions as "trying to smother" the victim. She said the Defendant looked up, threw the pillow down, and ran into the bathroom. The Defendant was in the bathroom briefly before returning to the victim's bed, picking him up, and telling him "I love you, mama's heart." Ms. Harkless immediately requested a break, and she reported the incident to the nurses.

Ms. Harkless testified that she was "in total shock" when observing the interaction between the Defendant and the victim. Ms. Harkless confirmed that, as she watched the Defendant, it was her belief that the Defendant was harming the child. She stated that she did not hear the Defendant say "peekaboo" at any time. Ms. Harkless recalled that the victim continued to whimper when the Defendant placed the pillow on his face. After the Defendant removed the pillow, he "stiffened up."

Kimberly Brown, a nurse, testified that she had worked at T.C. Thompson Children's Hospital for twenty-one years. She recalled working on May 5, 2011, and receiving a phone call to notify security of an issue. After requesting security, Ms. Brown went to the victim's room where she met with Ms. Harkless. She said Ms. Harkless was normally very calm but appeared upset at what she had witnessed. Ms. Brown explained that Ms. Harkless normally worked as the unit clerk. Ms. Brown described this job as "difficult" and said that Ms. Harkless was good at her job and remained calm regardless of the circumstances.

Ms. Brown testified that physicians ordered sitters for a patient when there was suspicion of physical, social, or mental danger to a child. A sitter was to observe the child continuously during the child's stay in the hospital.

On cross-examination, Ms. Brown testified that the floor nurse was the person responsible for documenting notes in a patient's records. The floor nurse and not Ms. Harkless would have recorded the notes about the incident in the victim's chart. Ms. Brown agreed that a physician may also order a sitter if a patient had an eating disorder or posed a threat to his or herself.

William Gregory, a Walden Security employee, testified that he worked at Erlanger. He stated that he spoke with Ms. Harkless about the incident involving the pillow. He recalled that Ms. Harkless was "adamant and extremely upset" about the Defendant's treatment of the victim. Mr. Gregory confirmed that, after the pillow incident, the Defendant was removed from the hospital, and the victim was relocated to an undisclosed location in the hospital as a safety precaution.

Annamaria Church, a pediatrician, testified as an expert witness in the field of pediatric medicine. She stated that she was the Division Chief of general pediatrics and

served as the Medical Director of the Child Protection Team at Erlanger. Dr. Church stated that the victim was admitted on May 2, 2011, with a history of chronic diarrhea beginning when he was six months old. The treating physician found no etiology for the diarrhea so admitted the victim for observation. Dr. Church explained that sitters are placed in patient rooms to "ensure the safety of the child." She stated that sitters are to sit and observe while in the patient room. If they have any concerns, they are to notify the physician or a nurse. Dr. Church confirmed that she had worked with Ms. Harkless before and not had "any issues" with her as a sitter.

Dr. Church testified that she was notified on May 5 that there had been a couple of incidents that caused concern, the latest incident being the Defendant's placing a pillow over the victim's head. Dr. Church was not treating the victim, but she was notified due to her position as Medical Director of the Child Protection Team. Dr. Church advised the resident to notify Child Protective Services ("CPS") and remove everyone from the room other than the sitter.

Dr. Church testified that suffocation with a pillow is "difficult" but "possible." She said that suffocation is the act of cutting off a person's oxygen supply and placing something over the child's mouth and nose in an attempt to diminish or stop oxygen flow. She said that the eventual effect of suffocation is death but that oxygen deprivation can damage organs. Dr. Church explained that the Defendant's placing a pillow over the victim's face caused concern because it indicated "an escalation of activity" or "detrimental behavior" toward the victim. She stated that although the event did not physically harm the victim, it would be a scary event for a child.

Dr. Church confirmed that the victim was hospitalized for gastric issues but there was no medical evidence to support there was a problem during his hospital admission.

The State concluded its case-in-chief, and the Defendant presented the following proof: Galen Fugh, a Chattanooga Police Department officer, testified that he would not have pursued prosecution if he had been made aware that the alleged attack lasted one or two seconds and that the Defendant was "playing peekaboo."

On cross-examination, Officer Fugh agreed that no witness he spoke with related to this case ever referred to the incident as anything other than "smothering."

Based upon this evidence the jury convicted the Defendant of attempted aggravated child abuse, a Class B felony. The parties agreed on a sentence, the Defendant waived a sentencing hearing, and the trial court ordered a sentence of nine years to be served through supervised probation. It is from this judgment that the Defendant now appeals.

9

## II. Analysis

On appeal, the Petitioner asserts that: (1) the evidence presented at trial is insufficient to support her conviction; (2) the trial court erred in allowing the State to present evidence of the Defendant's prior bad acts; and (3) the trial court failed to instruct the jury on lesser-included offenses.

## A. Sufficiency of the Evidence

The Defendant asserts that "there was absolutely no evidence that the child's breathing was in any way interrupted" and, therefore, the evidence is insufficient to sustain her conviction. The State responds that the Defendant's act of "grabbing a pillow and placing it over her child's face was a substantial step towards the commission of aggravated child abuse." As such, the State asks us to affirm the conviction.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of

10

witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Aggravated child abuse occurs when a person commits child abuse, as defined in Tennessee Code Annotated section 39-15-401(a), and the "act of abuse . . . results in serious bodily injury to the child[.]" T.C.A § 39-15-402(a)(1). Child abuse occurs when a person knowingly treats a child under eighteen years of age "in such a manner as to inflict injury[.]" *Id*. § 39-15-401(a).

Our Supreme Court has held that child abuse is a "nature-of-conduct" offense and that, "[a]s such, the prosecution need not prove that the defendant 'intended' to cause injury to the child." *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003). The State, however, must show that the defendant was "aware of the nature of the conduct" when he treated the victim "in such a manner as to inflict injury." T.C.A. §§ 39-11-302(b), 39-15-401(a); *State v. Hanson*, 279 S.W.3d 265, 277 (Tenn. 2009). Finally, because the Defendant herein was convicted of attempted aggravated child abuse, we note that our criminal attempt statute states as follows:

11

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

(c) It is no defense to prosecution for criminal attempt that the offense attempted was actually committed.

T.C.A. § 39-12-101.

The evidence, viewed in the light most favorable to the State, showed that the Defendant had repeatedly presented the victim to physicians, from the time he was six months old, with the complaint of chronic diarrhea. When extensive testing and evaluation by multiple specialists revealed no cause, and the current treating physician received conflicting stories from each of the victim's parents, the victim was admitted to the hospital for observation. While hospitalized, the victim exhibited none of the symptoms the Defendant had insisted he suffered from. Further, the Defendant became aware of a DCS complaint against her. After learning of the DCS complaint and multiple days with no indication of the victim having diarrhea, the Defendant exhibited "increased anxiety." On the day of the incident, the Defendant exhibited frustration with the victim, who had been whining throughout the day. The Defendant and the victim took a nap mid-day and upon both of them waking, the victim began whining again. The Defendant responded by placing a pillow over the victim's face while admonishing him, "I'm not going to hear this." The Defendant looked up to see the sitter watching her, dropped the

12

pillow, and fled to the bathroom. The victim stiffened in response to the Defendant's conduct and stayed quietly in the bed until his mother returned, picked him up and affectionately addressed him. The sitter observing the victim said she was shocked by the Defendant's conduct, immediately reported the act, and the Defendant was escorted from the hospital.

From these facts, we determine that a rational jury could conclude that the Defendant was acting with the intent to cause serious bodily injury to the victim. By grabbing a pillow and covering the victim's face, the Defendant took a substantial step toward inflicting serious bodily injury and satisfied the requirements of attempted aggravated child abuse. Accordingly, we conclude that the evidence is sufficient to support the Defendant's conviction for attempted aggravated child abuse. The Defendant is not entitled to relief as to this issue.

## B. Prior Bad Acts

The Defendant argues that the trial court erred when it allowed testimony regarding the victim's prior treatment and Ms. Harkless's observations of other interactions between the Defendant and the victim on May 5, 2011. The State responds that the trial court properly admitted evidence of the victim's prior medical treatment to explain his admission to the hospital for observation and not as propensity evidence. As to Ms. Harkless's other observations on May 5, the State contends that the Defendant has waived review for failure to object at the time of the testimony.

The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id*. Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id*. at 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id*. at 403.

Evidence of other crimes, wrongs, or bad acts is not admissible to prove the character of a person to show action in conformity with that character. *Id*. at 404(b). Such evidence may be admissible, however, for "other purposes." *Id*. Such evidence is admissible for other purposes, provided that the trial court: (1) upon request, holds a hearing outside the jury's presence; (2) determines that a material issue exists other than conduct conforming with a character trait and, upon request, states the basis for its determination; (3) finds proof of the other crime, wrong, or act to be clear and

13

convincing; and (4) determines that the probative value of the evidence is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b). The safeguards in Rule 404(b) ensure that defendants are not convicted for charged offenses based on evidence of prior crimes, wrongs, or acts. *State v. James*, 81 S.W.3d 751, 758 (Tenn. 2002). When a trial court substantially complies with the procedural requirements of Rule 404(b), the standard of appellate review of the trial court's decision is abuse of discretion. *See State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003); *James*, 81 S.W.3d at 759. If the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

The State filed a motion to admit evidence pursuant to Tennessee Rule of Evidence 404(b) to prove intent and motive. The Defendant filed a related motion seeking to exclude evidence of alleged "medical abuse." The State asserted that the Defendant had sought unnecessary medical treatment for the victim causing the victim's father and physicians to become suspicious that the symptoms were fabricated. After a hearing, the trial court stated that there was not clear and convincing evidence of medical abuse. It further expressed concern that the jury might be confused about what was charged in the indictment and what was testified to in regard to medical abuse. The trial court ruled that the State would be allowed to question witnesses about the history of medical treatment and complaints but not "medical abuse." The trial court expressed the importance of the jury understanding that "the only abuse that is at question here is the, the act with the pillow."

Consistent with this ruling, Dr. Harrison and Dr. Laman testified regarding the victim's medical history leading up to his hospitalization. The State was restricted to eliciting only testimony regarding the victim's medical history and treatment and precluded from eliciting testimony about medical abuse. The victim's medical history and treatment were relevant to this case to help explain why the victim was hospitalized with a sitter at the time of the incident. Neither the Defendant's involvement in a custody battle nor her act of seeking medical treatment for her child show a propensity toward smothering her child. Even assuming this constituted a bad act, the evidence would have been admissible to show motive and intent pursuant to 404(b). Therefore, we conclude that the trial court did not err in admitting Dr. Harrison's and Dr. Laman's testimony about the victim's medical history and treatment.

Further, the trial court properly instructed the jury on the manner in which it should consider the victim's medical history and treatment, and this Court must presume that a jury followed the trial court's instructions. *State v. Odom*, 336 S.W.3d 541, 562 (Tenn. 2011). The Defendant is not entitled to relief.

14

As to the issue of testimony regarding other incidents occurring on May 5, 2011, the only reference to this issue in the Defendant's brief is "In further permitting the State to introduce evidence of other alleged prior bad acts by Defendant on May 5, 2011, while her child was in the hospital, the Trial Court further prejudiced Defendant." The Defendant makes no argument beyond this statement. Further, there is no reference to which testimony in the record she refers, and she does not cite to any specific authority to support this allegation regarding Ms. Harkless's testimony. Therefore, the Defendant has waived our review of this issue. *See* Tenn. R. Ct. Crim. App. 10(b).

## C. Jury Instruction

In her final issue on appeal, the Defendant contends that the trial court failed to instruct the jury on the lesser-included offenses of assault by offensive touching, attempted aggravated assault, reckless endangerment, and attempted reckless aggravated assault. At trial, the trial court charged the jury only as to the lesser-included offenses of attempted child abuse and attempted assault. The State responds that the Defendant has waived this issue for failure to make a written request pursuant to Tennessee Code Annotated section 40-18-110(c).

In support of this issue it appears the Defendant relies on law that is no longer applicable; therefore, we discuss the transition of this law briefly. In 2001, the Tennessee Legislature amended section 40-18-110 to provide that an instruction as to a lesser included offense is waived unless the defendant requests in writing, prior to the trial court's charge to the jury, that such an instruction be provided to the jury. T.C.A. § 40-18-110(c). This amendment to Tennessee Code Annotated section 40-18-110 governs all trials on or after January 1, 2002, as is present in this case. 2001 Tenn. Pub. Acts 338, § 2. Because the Defendant did not request in writing an instruction on the lesser included offenses she now asserts should have been included in the trial court's charge to the jury, the Defendant has not presented a ground upon which relief may be granted. T.C.A. § 40-18-110(c). Therefore this issue is without merit.

The Defendant failed to make a written request for this jury instruction and made no objection to the trial court's proposed instructions, but she did raise it in her second amended motion for new trial. The trial court denied the motion for new trial, ruling that it properly charged the jury; however, failure to instruct on a lesser included offense was not a proper issue for a motion for new trial due to the lack of a written request, nor is it a proper issue for appeal. "Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for new trial or on appeal." T.C.A. § 40-18-110(c). The Tennessee Supreme Court has held that "if a defendant fails to request an instruction on a lesser-included offense in writing at trial, the issue will be waived for purposes of plenary appellate

15

review and cannot be cited as error in a motion for new trial or on appeal." *State v. Page*, 184 S.W.3d 223, 229 (Tenn. 2006). Our Supreme Court also made clear, however, that when a defendant waives a jury instruction for failure to request it in writing, an appellate court may still review the issue for plain error. *Id.* at 230.

It is the Defendant's burden to persuade an appellate court that there was plain error in the trial proceeding. *State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007). The Defendant does not acknowledge that she failed to submit a request for lesser-included offenses to be charged at trial nor does she address plain error review. The Advisory Commission Comments to Tennessee Rule of Appellate Procedure 13(b) suggest that the discretionary authority for the declaration of plain error "be sparingly exercised." T.R.A.P. 13(b), Advisory Comm'n Comments. Our review of the record reveals that this issue was not properly preserved and the Defendant has not shown that she is entitled to plain error review.

### III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

16